UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
ANTHONY WILLIAMS,

                     Petitioner,

      -against-

DANIEL A. SENKOWSKI,

                    Respondent.
-----------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 03-3123

**APPEARANCES:**

For Petitioner:
     Anthony Williams, Pro Se
     98-A-2329
     Auburn Correctional Facility
     P.O. Box 618
     Auburn, New York 13024

For Respondent:
     Nassau County District Attorney's Office
     262 Old Country Road
     Mineola, New York 11501
     By:   Tammy J. Smiley,  Esq., A.D.A.
           Denise F. Pavlides, Esq., A.D.A.

**HURLEY, Senior District Judge:**

Anthony Williams ("Williams" or "petitioner"), proceeding pro se, petitions

this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, vacating his

judgment of conviction rendered on February 27, 1998 in the County Court in the

State of New York, County of Nassau (the "trial court") for one count of murder in

the first degree in violation of New York Penal Law § 125.27(1)(a)(vii), one count of

criminal possession of a weapon in the second degree in violation of New York Penal

Law § 265.03, two counts of criminal possession of a weapon in the third degree in

violation of New York Penal Law § 265.02(4), two counts of attempted robbery in the first degree in violation of New York Penal Law §§ 110.00/160.15(1) and 110.00/160.15(2), and one count of criminal possession of criminal of stolen property in the fifth degree under New York Penal Law § 165.40.

Petitioner seeks habeas relief on five grounds, to wit: (1) his right to a fair trial was violated by the admission of evidence of the other crimes committed by petitioner and his co-defendant prior to the murder of Alain Erlich, the introduction into evidence by defense counsel of newspaper articles revealing that Williams had prior criminal convictions, and various instances of prosecutorial misconduct; (2) the jury's verdict was against the weight of the evidence; (3) he was denied his constitutional right to the effective assistance of counsel; (4) his right to due process was violated when the trial court permitted the murder victim's wife to view him in a line up and to identify him at trial even though she had been irreparably tainted by newspaper photographs; (5) his sentence was unlawful and excessive.[1]

For the reasons set forth below, the petition is denied.

---

[1] Petitioner set forth eight grounds in his petition. Pet. at 7-9. But ground three of those grounds charges that the introduction of newspaper article revealing his prior convictions denied him his rights to a fair trial and to effective assistance of counsel. That ground is being treated as part of his fair trial and effective assistance of counsel claims, thereby reducing the listing of his grounds from eight to seven. Additionally, ground five, which charges prosecutorial misconduct, is discussed as part of the denial of a fair trial claims. This reduces the listing of grounds to six. Finally, grounds seven and eight alleging that the persistent felony sentence was unlawful and the sentence imposed was excessive will be treated together, further reducing the listing of grounds to five.

# BACKGROUND

## I.     The Case Against Petitioner

Williams and his codefendant Jermaine Smalls, also known as "Red,"
engaged in a robbery spree between July 30 and 31, 1996.  At the time Smalls was
18 years old and knew Williams by his nickname "BeeBee" from their neighborhood
in Far Rockaway. (Trial Tr. 729-31.)

On July 30, 1996, he and defendant discussed committing robberies, with
Williams asking Smalls to "do the robberies with him." They went to Jamaica,
Queens where Williams entered a "dollar van"[2] while Smalls waited at the corner.
Tawana Smith was a passenger in the van on her way home from work when
Williams, who she estimated was between 18 and 25 years old, entered the van and
sat behind her.  Smith felt something cold on her neck, turned around, looked at
Williams' face and saw him pointing a light or silver-colored  automatic gun in her
face. Williams told her to take off her necklace, watch and ring, and give them to
him; she complied.  After he had her jewelry, Smalls tried to enter the van.
Williams told him they were not taking that van and Williams exited the van.
Smith saw Williams and Smalls walk across the street, looking back at the van.
Williams handed Smalls the gold necklace. (Trial Tr. 504-14, 529-30, 536-38, 734-
36.)

The next day, Williams met Smalls at Smalls' house and they discussed

---

[2] A dollar van is a private van that runs along a bus routs and charges one
dollar.

returning to Jamaica to do additional robberies. Williams, who is taller than Smalls, was wearing dark-colored jeans while Smalls, who is 5'6", was wearing a red jacket, red, green and white shirt, and cream colored shorts that were below his knees. Williams had a .380 caliber automatic pistol and gave Smalls a .32 caliber gun. The two then went to visit a friend in Far Rockaway who showed them a .25 caliber gun; Smalls left the room to use the phone and when he returned the .25 caliber gun was no longer insight. The two then went to Jamaica. (Trial Tr. 736-43.)

At about 9:00 p.m. on July 31, 1996, Jade Howard entered a dollar cab at Sutphin Boulevard and Archer Avenue in Jamaica, an area which is well-lit. Williams and Smalls then entered the cab. Howard was behind the driver, with Williams in the middle and Smalls on the passenger side. Howard identified Williams as the man who sat next to her and identified a photograph of Smalls as his companion. Williams tapped Howard on the shoulder and she turned to look at him. He was facing her and had a automatic gun at her side and demanded her jewelry and wallet. Williams took the money out of the wallet and put the money in his shirt pocket. According to Howard, Williams was in his mid-20's and wearing long dark pants and a light tan paisley shirt while Smalls wore long white shorts and zippered red jacket. Williams asked the driver to let them out; they exited the van and walked down Guy Brewer Boulevard. (Trial Tr. 542-59; 743-46.)

Williams and Smalls then spent time with two girls they met; they purchased beer, which came in a white plastic bag, and had one of the girls buy marijuana.

The four went to a park where they drank beer and smoked the marijuana. Williams asked Smalls for the jewelry and gave a bracelet to one girl and a necklace to another. They went back to Guy Brewer Boulevard where the girls went their separate way. (Trial Tr. 747-50.)

Williams and Smalls again entered a dollar van. Robert Haye, on his way home from work, had entered a dollar van between Guy Brewer Boulevard and Archer Avenue about 9:50 and sat behind the driver. Between 108th and 109th Avenues two men, who Haye saw talking to each other, got in the van; the taller man was wearing dark pants and a beige shirt and the other man was wearing a red jacket and beige shorts. Haye identified Williams as the man in the dark pants and a picture of Smalls as the man wearing the shorts. He estimated to the police that Williams was 20 years old and Smalls was 18. Williams sat behind Hays while Smalls sat further back in the van. Williams took his gun out, pulled an orange ski like cap out of his shirt and covered the gun with the hat; he then pointed the gun at Haye's back. Haye felt something sticking in his back, turned around, saw Williams and what he recognized as an automatic handgun. Williams demanded Haye's watch and money. After Haye complied, Williams told him to tell the driver he wanted to get out. At a red light at 144th Avenue and Guy Brewer Boulevard, less than a half block from the Belt Parkway, the driver pulled over and Haye exited the van. (Trial Tr. 593-610; 617-622; 751-53.)

As Haye exited, a woman entered the van, sat in the seat vacated by Haye and asked to go to Rosedale. Williams then tried to unclasp her necklace; the

woman screamed, told the driver what happened and asked to be let out. When the van stopped, the woman, Smalls and Williams all exited. Smalls heard the driver tell the woman to call the police but she replied she would take care of it. As Williams and Smalls walked, a car with tinted windows pulled up and a woman said "that's them." The driver called out "don't move" and put a gun out the car window. Williams ran up the street and Smalls ran behind some houses. Eventually, Smalls came out of hiding and met up with Williams. Smalls was hatless while defendant wore his orange knit hat. When Smalls asked Williams if he was alright, he replied that he was not going home empty handed. They walked until they came to the Green Acres Mall parking lot. They tried to get on a dollar van but it was full. They walked around looking for a dollar van but did not see any. (Trial Tr. 607-08; 752-60; 759-61.)

The Green Acres Road apartment complex consists of three two-story townhouses in the shape of a horseshoe with parking in the middle and the open part of the horseshoe leading into the Green Acres Mall. Christopher and Courtney McNaught lived with their mother in a second floor apartment located on the right side of the horseshoe. Ilona Erlich lived with her husband, Alain, and her daughter, Alicia, in a second floor apartment located at the back of the horseshoe. The Erlichs parked their two vehicles, a Chevy Malibu and a pick-up truck, slightly to the left of their living room window. A floodlight mounted to the left of their window illuminated half way down the court with the end of the parking lot closest to the Erlich's brightly lit. (Trial Tr. 626-67, 931-33, 945, 966-67, 989-96.)

On the evening of July 31, 1996, Mrs. Erlich expected her husband home from his second job at about 10:50 p.m. Just before 11:00 p.m., Christopher McNaught's uncle, Louis Maiello, pulled into the Green Acres Road apartment complex to bring Christopher home. Before Christopher went inside, both he and his uncle saw Alain Erlich driving into the parking lot. Courtney McNaught also saw her neighbor pull into his spot as she looked out the window. Mrs. Erlich heard her husband pull in as their car had a distinctive sound. As Maiello was waiting for the traffic light to change so he could exit the parking lot he saw a black man in his thirties, wearing an orange ski hat, an oversized beige shirt and blue jeans, walking to the apartment complex with his hands in his pockets. (Trial Tr. 935-37, 955-61, 969-70, 989, 996-97.)

As Courtney looked out the window, she saw Mr. Erlich park his car and then go start his pick-up truck. When Mr. Erlich exited the truck, Williams was already behind him. Smalls was on the sidewalk by the entrance to the complex's parking lot; he turned to see if anyone was coming and when he turned back Williams had his gun drawn and pointed at Mr. Erlich's back. Smalls looked away again and when he turned back the gun was at Mr. Erlich's neck. Courtney had been watching Mr. Erlich on and off when something caught her eye. A black man taller than Mr. Erlich was next to him, holding a gun and then just shot Mr. Erlich. The shooter was wearing what Courtney thought was a baseball cap and a light colored shirt and bent down to grab at Mr. Erlich's back pocket. Smalls heard one gunshot and turned to see Mr. Erlich on the ground with Williams bent over him trying to

get into his pockets. (Trial Tr. 762-64, 970-76.)

Waiting by the staircase for her husband to come upstairs, Mrs. Erlich heard what sounded like a firecracker or car backfiring and ran to the open living room window. She saw her husband lying on the ground with a man facing the apartment and bending over her husband trying to reach behind him. She screamed and the man looked up in her direction; the floodlight allowed her to see him quite clearly and she noticed he was wearing an orange cap and the clothing on his upper body was light colored. She identified Williams as the man standing over her husband. (Trial Tr. 997-1001.)

Christopher McNaught, having just arrived inside his apartment, heard what sounded like a pistol shot and ran to the window. He saw a black man wearing an orange ski hat, light colored shirt and dark pants bending over Mr. Erlich near his pockets right in front of the Erlich's apartment. Both he and his sister heard Mrs. Erlich scream and saw the man look up at her. (Trial Tr. 938-45; 974-75.)

After looking up at Mrs. Erlich, Williams turned and ran. He was not carrying a white plastic bag as he ran. Mrs. Erlich told her daughter she thought her father had been shot or hurt and told her to go outside to see if he was okay. She called 911 and described the assailant as a "kid" with an orange cap. Christoper McNaught told his mother and sister to call 911 and went outside to see if he could help. (Trial Tr. 941, 943-46, 975, 1001-02, 1022-24.)

After hearing the gunshot and seeing Williams bent over the body, Smalls ran until he reached Sunrise Highway and then went into the Green Acres Mall

parking lot. Not familiar with the area, he went to a Mobil gas station and tried to get a ride from a customer. Meanwhile Police Officer Wighaus had received information about a shooting near Green Acres Mall. Driving on Sunrise Highway about 11:20 he and his partner saw a black man, wearing a red jacket and white-ish/tan shorts, walking very fast eastbound by a Mobil gas station, looking in all directions and holding something in his waist band. As they proceeded, the officers saw the man talking to a man fueling his car. The officers pulled into the gas station. When Smalls saw the police, he walked to the cashier area. The officers displayed their badges, identified themselves as police and asked Smalls to come over to their car. Smalls ran behind the gas station where he removed a .32 caliber revolver from his waistband and threw it; he dropped a white plastic bag with beer still inside and jumped over a fence. Officer Wighaus followed Smalls behind the gas station where he saw Smalls throw a metallic object which appeared to be a gun to the ground. The officers followed Smalls to a wooded area and then to a store parking lot behind the gas station where they caught him. Smalls had no weapons or hat on him. Although when Wighaus first saw Smalls he was carrying a white bag, the bag was not recovered. A search of the rear of the Mobil gas station yielded a .32 caliber revolver. Smalls was arrested and taken to police headquarters. (Trial Tr. 766-69, 832-33, 903-18, 921-24.)

Officer Carroll responded to a 10:56 p.m. notification of a shooting and arrived at the Green Acres Road apartment complex in less than two minutes. He saw Mr. Erlich lying on the ground at the end of the parking lot; the complex was

well lit, including the area where the body lay. Unable to find a pulse, Officer Carroll assumed Mr. Erlich was dead. On the ground there was personal property including an eyeglass case. Carroll met the victim's wife who was basically incoherent and in a state of shock. Officer Carroll tried to get a description from Mrs. Erlich who told him the shooter was a man with an orange hat. Officer Knatz who also responded, asked Mrs. Erlich, who was clearly distraught, if the man was black or white but she did not answer. He asked a second time but she only pointed in a northbound direction toward the Green Acres Mall. An ambulance then arrived at approximately 11:08 and left with Mr. Erlich about 11:11. Mrs. Erlich was not allowed to ride with her husband. (Tr. 630-39, 1003-04, 1035, 1068-69, 1093-95.)

Detective Downes arrived at the apartment complex at about 11:40 p.m. The area of the shooting was well illuminated by the floodlight on the building. He saw a large amount of blood and brain matter where Mr. Erlich was shot. There were car keys and an eyeglass case near the pool of blood. He also saw a discharged shell casing and what appeared to be a bullet fragment (but turned out to be a pebble) near the pool of blood. Later he went to the Mobil Gas station and secured the .32 caliber revolver found there by Officer Stein. (Trial Tr. 672-75, 684-86, 695, 705, 922.)

Detective Eisele identified the discharged shell casing as .25 caliber and testified that all the marking on the shell casing were consistent with it having been fired from a .25 automatic gun. The shell was in good condition and did not appear old or rusty or as if it had been run over in the parking lot. According to

Detective Eisele a .25 caliber bullet cannot be fired properly from a .32 caliber revolver or a .380 caliber semi-automatic pistol. There were no discharged .32 caliber casings found in the .32 caliber revolver recovered at the Mobil station. (Trial Tr. 1129-1160.)

The deputy chief medical examiner testified there was a single perforating gunshot wound to Mr. Erlich's head in the left temple that was fired from between six and eighteen inches away and exited from the right temple area. The size of the entrance wound and the nature of the injury were more consistent with a .25 caliber bullet than any other caliber. (Trial Tr. 867, 874-79, 881, 892-93.)

Smalls was initially evasive when questioned at police headquarters. Eventually, he decided to help the police and gave an oral, then a written, statement to Detective Kuhn identifying Williams, who he knew only as BeeBee, as having shot the man in the parking lot. Smalls called his girlfriend to find out "BeeBee's" real name. She told him his name and that he was with her. Following police instructions to lure Williams to a movie theater next to the Green Acres Mall, Smalls told his girlfriend to have Williams pick him up at the theater. The police were waiting at the theater for Williams and arrested him. A pat down search revealed a loaded .380 semi-automatic gun in William's pocket, which gun was darker that the gun Williams exhibited to Tawana Smith in the dollar van on July 30. (Trial Tr. at 538, 769-73, 814-15, 1042-52.)

Williams was driven to police headquarters by Officer Knatz and two other policemen. Although there was no discussion in the car about the shooting, not long

after they left the theater, Williams asked, "is he dead?" Knatz looked at Williams but did not respond. Williams again said "is he dead?" Williams also stated a number of times during the ride to headquarters that he wanted to work something out - he knew drug dealer and was able to get guns in Hempstead and Freeport. Knatz told Williams that detectives would be speaking with him.

Williams arrived at police headquarters about 6:25 p.m. and was brought to the homicide squad although there were no signs identifying it as such. Detective Hines had the officers remove defendant's property and put it on the desk in the interview room; Hines then separated the Bulova watch Williams had been wearing from his other property. Detective Kuhn entered the interview room, introduced himself and Detective Lavelle, but did not identify either of them as homicide detectives. Kuhn asked Williams his name and basic pedigree questions such as his age, address, and telephone number. (Trial Tr. 1059-60, 1102-4, 1169-72.)

Kuhn then informed Williams of his constitutional rights using a rights card and Williams said he understood his rights and waived his right to have counsel present. When asked how he came to be at the Green Acres Mall, Williams said he was "hanging out" at a cab stand talking to a cab driver and just went along for the ride when the cab driver got a fare to the mall. Williams stated that during the ride the cab driver showed him a gun which Williams put in his pocket. When questioned about July 31, Williams claimed he spent the afternoon in the park and, having gone home at 7:00 p.m., spent the evening on his own street. (Trial Tr. 1173-74, 1180, 1188-90, 1269-70.)

Kuhn questioned Williams about what transpired when he was arrested. When the police came the cab passenger asked what happened and then he (Williams) asked "Is he dead?" When Kuhn asked him who is dead, Williams replied "the guy." When asked what guy, Williams remained silent. Williams then told the detectives that he was with Smalls on July 31 and the two took a dollar van from 109th Street and Guy Brewer Boulevard to get back to Far Rockaway but when he got into an argument with a woman in the van, the driver threw all three of them off (i.e. Williams, Smalls and the woman). A few minutes later, the woman returned in a car with a man who stuck an Uzi or Mach 10 out the car window and told Williams and Smalls to stop. The two fled in different directions and Williams hid behind a house for about a half hour. He then left and walked until he was in a mall with a toy store where he called a cab. Williams could not tell the detective the name or phone number of the cab company or where he was when he called it. (Trial Tr. 1190-92.)

Kuhn left the interview room to speak with Smalls. While he was gone, Detective Ridden asked Williams what happened after he was chased by the man with the Uzi and took a cab home. He answered: "The guy got out of the car. I went up to the guy. No one was going to get hurt. The guy moved." When asked what happened next, Williams did not answer. Ridden asked where Smalls was during this time and Williams answered "over there." Ridden then asked what happened to the guy and Williams said he didn't know what Ridden was talking about. Kuhn then returned to the room and accused Williams of lying when he said he did not

know the passenger in the cab he took to the theater. Williams then admitted he knew the passenger was Smalls' cousin.  During the time he was with Williams, Kuhn never mentioned a shooter or a type of pistol and Williams never asked for a lawyer.  Kuhn and Ridden ended the interview about 7:50 p.m. (Trial Tr. 1193-97, 1271-74.)

Detectives Swanson and another detective were then assigned to interview Williams and began to do so about 8:00 p.m.  They introduced themselves and began the interview with pedigree questions. When Swanson then asked him if he knew "Red" (Smalls' nickname), Williams stated he had known him for about four to six weeks. When Swanson told Williams he was in Nassau County, Williams asked "[i]s he dead" and then said he had never been in Nassau County.  Williams was then asked to provide a detailed account of his activities starting at 5 :00 p.m. on July 31. He stated that he met Smalls near Smalls' Far Rockaway home and they bought a bottle of beer; he denied having a gun at that time asserting that the cab driver had given it to him. At about 7:00 p.m. they took a dollar van into Jamaica to 109th Street near a park and met two girls that they stayed with until sometime between 9:00 and 10:00 p.m.  They then took a dollar van towards Far Rockaway. Williams then recounted the story of having an argument with a woman on the van who accused him of trying to steal her chain, being thrown out of the van, encountering the man with the Uzi, splitting up from Smalls and hiding in a yard for a while, after which he headed towards a mall area.  Once at the mall he learned the phone number for a cab company and called a cab which arrived five or six

minutes later driven by a white man in his forties. The fare to Beach 51 Street in Far Rockaway was $11.25 and he gave the driver a seventy-five cents tip. At this point they took a break with Williams using the bathroom and having pizza and a soda. (Trial Tr. 1247-62.)

The interview resumed between 2:00 and 2:30 a.m. Swanson told Williams he was lying because Swanson had checked and there were no fares from Valley Stream to Far Rockaway. Williams again said, "is he dead?" to which Swanson replied that he had asked him that several times and that Williams knew the answer was yes he was dead. Swanson asked him to tell him what happened but Williams insisted there was nothing to tell. Swanson asked Williams how many people he had robbed and Williams said none. Although Williams had not been told that the police were investigating a shooting and no particular type of gun was mentioned, when asked again to recount what happened William said he had not shot anyone but asked "what kind of gun was he shot with, a .25?" (Trial Tr. 1259-62.)

On August 3, 1996, Robert Haye went to the police to tell them he had been watching cable channel one when he saw a photo of the man who robbed him. The next day Detective Hines showed Haye the Bulova watch which Williams was wearing when he was arrested. Haye testified the watch was his as the gold marking for the two o'clock position was loose and floating freely under the glass. He also identified the red jacket Smalls had been wearing. Also on August 3, 1996, Jade Howard saw a Daily News article and accompanying photograph of Williams

and recognized him as the man who robbed her. Later that day she also saw Williams' photo in an Newsday article. Both articles were about the shooting of Mr. Erlich. (Trial Tr. 564-68, 594-96, 609-11,623-24, 1104-05.)

Although Mrs. Erlich did not read newspapers or watch television in 1996, she saw the article in Newsday containing photos of two men when a neighbor brought her the paper. She recognized the photo of Williams as the man she saw standing over her husband but did not recognize the other man. She did not read the article and did not see the article in the Daily News. At a line-up conducted on February 5, 1997, Mrs. Erlich identified Williams, number three in the six man line-up, as the man who was bending over her husband and looked up at her when she screamed. (Trial Tr. 1009-11, 1028-38, 1198-99.)

Williams testified as follows at trial. He was 38 years old on July 31, 1996 and had just been released on parole after serving a prison term of two to four years. He recounted for the jury his prior record dating back to 1980 and included convictions for burglary, attempted robbery, petit larceny and a gun charge. Upon his release he was living with his mother and Smalls' building was right next door. He met Smalls just a few days before the incident when Smalls' former drug partner pulled a gun on Williams and they had a "shoot out." The partner fled to Virginia and Smalls, needing a new partner to back him up, asked Williams to go with him to Jamaica to pick up some drugs. On July 31, 1996, they went to go pick up drugs in Jamaica. Williams had the .380 automatic that was in his possession when he was arrested, having retrieved the gun from his girlfriend's house. He and

Smalls never went to Billy Barnes' home on July 31 and he never had a .25 caliber gun. The men with the drugs never came so eventually he and Smalls got on a dollar van, which is when he had an argument with a girl and he, Smalls, and the girl were thrown off the van. He and Smalls started to walk to the Five Towns when a car pulled up and one of the two men in the car pulled out an Uzi or Mach 10. He ran towards Jamaica while Smalls ran towards Nassau. He heard a couple of gun shots and hid in a backyard. When he came out of hiding he ran back to Jamaica and took a dollar van back to Far Rockaway. He denied telling the police he took a cab back. He never saw Smalls again. The next day he was passing the home of Smalls' girlfriend when she called to him. While they were talking, Smalls telephoned his girlfriend and told her to have Williams pick him up at the movie theater. Williams and Smalls' nephew took a cab to theater and when they arrived Williams was removed from the cab and arrested. He lied to the officers about the cab driver giving him the gun out of impulse and tried to make a deal. A police officer told him he would have to talk to a homicide detective. When he heard that Williams' asked: "What's up. Is my man Red dead or something?" The officer did not respond so Williams repeated what he said thinking Red must have gotten killed. He asked about Red being dead again at the police station. When he was alone with Detective Ridden, Ridden beat him, wanting him to sign a statement that he committed the murder. He had no injuries that he complained of. He denied making the statements to any of the police officers claiming he "don't make statements at all, in precincts." Williams stated that he and Smalls were in the

17

same van being transported to the Courthouse on August 7 or 8. Williams asked Smalls what happened after they split when being shot at and Smalls said he saw a man in a parking lot and was going to rob him but the man turned quickly and Smalls shot him. (Trial Tr. 1299-1390.)

## II.    The Verdict

Petitioner was found guilty of one count of murder in the first degree in violation of New York Penal Law § 125.27(1)(a)(vii), one count of criminal possession of a weapon in the second degree in violation of New York Penal Law § 265.03, two counts of criminal possession of a weapon in the third degree in violation of New York Penal Law § 265.02(4), two counts of attempted robbery in the first degree in violation of New York Penal Law §§ 110.00/160.15(1) and 110.00/160.15(2), and one count of criminal possession of stolen property in the fifth degree under New York Penal Law § 165.40.

Petitioner was adjudicated a persistent violent felony offender pursuant to N.Y. Penal Law § 70.08 and New York Criminal Procedure Law § 400.16 and sentenced to a term of life imprisonment without parole for the first degree murder conviction, one-year for the fifth-degree criminal possession of stolen property conviction, and to an aggregate term of twenty-five years to life for the second- and third-degree weapon possession and attempted first-degree robbery convictions, to be served concurrently with the sentence imposed on the murder conviction.

## III.    Post Verdict Proceedings

On appeal, the Appellate Division, Second Department found that the proof

of petitioner's guilt was legally sufficient and that the jury's verdict was not against the weight of the evidence. *People v. Williams*, 290 A.D.2d 570, 571 (2d Dept. 2002). The Appellate Division further found that petitioner was erroneously adjudicated a persistent violent felony offender and therefore modified the judgment of conviction by vacating the sentences imposed on the weapon possession and attempted robbery convictions and remanded the case to County Court for re-sentencing on those counts. *Id*. The Appellate Division found petitioner's remaining contentions "without merit." *Id*. Williams' application for leave to appeal to the New York Court of Appeals was denied on June 17, 2002. *People v. Williams*, 98 N.Y.2d 682 (2002).

While his leave application to the Court of Appeals was still pending, the County Court adjudicated petitioner a discretionary persistent felony offender and re-sentenced him to an aggregate term of twenty-five years to life for the second- and third-degree weapon possession and attempted first-degree convictions, to be served concurrently with the sentences previously imposed. Williams appealed and on August 23, 2004 the Appellate Division affirmed defendant's re-sentence. *People v. Williams*, 10 A.D.3d 460 (2d Dept. 2004).

Petitioner then filed a motion, pursuant to N.Y. Criminal Procedure Law 440.10 to vacate the judgment. The motion was denied by Order dated December 9, 2007. By Order dated July 23, 2008, the Appellate Division denied a certificate for leave to appeal.

**IV.    Procedural History of the Case as to Present Petition**

Williams' petition seeking habeas relief was filed on June 20, 2003.  By order filed on January 14, 2004, the petition was administratively closed due to the petitioner's failure to exhaust available state remedies.  That closure was thereafter vacated, petitioner having pursued, albeit unsuccessfully, the prior unexhausted claims.  As a result, petitioner's application is both timely and ripe for review.

## DISCUSSION

**I.    Legal Standard -  Habeas Corpus and the AEDPA**

A federal court is empowered to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(b)(1).   In order to obtain relief, an individual in custody must demonstrate, inter alia, that he has: (1) exhausted all of his State remedies; (2) asserted his claims in his State appeals such that they are not procedurally barred from federal habeas review; and (3) if his appeals were decided on the merits, overcome the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *Philbert v. Brown*, 2012 WL 4849011, at *5 (E.D.N.Y. Oct. 11, 2012)**.**

**A.    AEDPA Deference Standard**

Under the AEDPA, a writ of habeas corpus shall not be granted on a claim that was "adjudicated on the merits" in the state court unless that state court's decision was "was contrary to," or involved an "unreasonable application" of "clearly

established Federal Law" as determined by the United States Supreme Court or "was based on an unreasonable determination of the facts" in light of the evidence presented to the state court. 28 U.S.C. § 2254 (d); *Thaler v. Haynes*, 559 U.S. 43, 47 (2010). "A state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002) (internal quotation marks omitted).

"Clearly established federal law refers to the holdings, as opposed to the dicta, of the [United States] Supreme Court's decisions as of the time of the relevant state-court decision." *Howard v. Walker*, 406 F.3d 114, 122 (2d Cir. 2005) (internal quotation marks omitted). A decision is "contrary to" established federal law if it either "applies a rule that contradicts the governing law set forth in" a United States Supreme Court case, or it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [its] precedent." *Penry v. Johnson*, 532 U.S. 782, 792 (2001) (internal quotation marks and citations omitted). A decision is an "unreasonable application of" clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (internal quotation marks and citation omitted).

Under the AEDPA, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

21

incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (internal quotation marks omitted).

**B.    Exhaustion**

"Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State."). The Supreme Court has held:

> Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process.

*O'Sullivan*, 526 U.S. at 845; *accord Smith v. Duncan*, 411 F .3d 340, 347 (2d Cir. 2005). Thus, a petitioner is required to have presented each claim to all available levels of the state courts. *See, e.g., Baldwin v. Reese*, 541 U.S. 27, 29 (2004) ("[T]he prisoner must fairly present his claim in each appropriate state court (including a state supreme court with powers of discretionary review.")) (citations and internal quotation marks omitted). The petitioner must also have fairly presented the "federal nature" of each claim to the state courts. *Id.; Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) (per curiam); *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005).

If a petitioner has not exhausted his claims in state court but no longer has a state forum in which to raise his claims, the claims are deemed exhausted and procedurally barred. *Bossett v. Walker*, 41 F.3d. 825, 829 (2d Cir. 1994).

## C. Procedural Default

Under the procedural default doctrine, federal habeas is unavailable when "(1) a state court has declined to address a prisoner's federal claims because the prisoner has failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." *Walker v. Martin*, – U.S. –, 131 S. Ct. 1120, 1127 (2011) (internal quotation marks and brackets omitted.)   The procedural rule or requirement must be "firmly established" and "regularly followed" in order to qualify as an adequate procedural ground. *Beard v. Kindler*, 558 U.S. 53, 60-61 (2009).

Despite having defaulted on his federal claim in state court, a state prisoner can obtain federal habeas review either by demonstrating "cause for [the] state court default," and actual prejudice as a result of the violation of federal law, or showing that the failure to consider the claim will result in a "fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Coleman v. Thompson*, 501 U.S. 722, 731 (1991) [3].

---

[3] The "fundamental miscarriage of justice" exception to the procedural default doctrine has explicitly been tied to innocence of the petitioner. This exception is grounded upon the crucial function of habeas review for " 'correcting a fundamentally unjust incarceration.' " *Spence v. Superintendent, Great Meadow Corr. Fac.*, 219 F.3d 162 (2d Cir. 2000).

Cause may be established in two ways.  The first way is to demonstrate that some objective factor, external to petitioner's defense impeded the efforts to raise the claim in state court, *see McClesky v. Zant*, 499 U.S. 467, 493 (1991), such as "a showing that the factual or legal basis for a claim was not reasonably available to counsel," *Strickler v. Greene*, 527 U.S. 263, 283 n.24 (1999).  Second, futility can constitute cause where prior state law has consistently rejected a particular constitutional claim.  *Gutierrez v. Smith*, 702 F.3d 103, 111-12 (2d Cir. 2012).

The requirement for "prejudice" is met by demonstrating "actual prejudice" from the errors alleged.  The error must result in "actual and substantial disadvantage, infecting the entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (internal quotation marks omitted); *accord  Strickland v. Washington*, 466 U.S. 668, 693 (1984); *U.S. v. Frady*, 456 U.S. 152, 170 (1982).

## II.     Discussion of Grounds Advanced in Habeas Petition

The five grounds advanced by petitioner, as previously identified, will now be addressed.

### A.     <u>Right to a Fair Trial</u>

Petitioner contends that his right to a fair trial was violated by the admission of evidence of the other crimes committed by petitioner and Smalls prior to the murder of Alain Erlich, the introduction into evidence by defense counsel of newspaper articles revealing that Williams had prior criminal convictions, and prosecutorial misconduct.

24

### 1. The Admission of Evidence of the Queens Robberies Committed Immediately Before the Murder

Williams' first ground for habeas relief is that the introduction of evidence concerning the four robberies committed prior to the murder was not probative of the murderer's intent or identity and violated his right to a fair trial. Much of his argument is premised upon what he perceives as the trial court's misapplication of the rule set forth in *People v. Molineux,* 168 N.Y. 264 (1901) which governs the admissibility of evidence of uncharged crimes in New York. Under the *Molineux* rule proof of another crime is competent to prove the specific crime charged only when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common plan or scheme embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; or (5) identity of the person charged with the commission of the crime on trial. However, "[t]he admissibility of evidence in a state court proceeding is a matter of state law, and is not are generally a ground for habeas relief." *Huber v. Shriver*, 140 F. Supp. 2d 265, 278-79; *see Estelle v. McGuire*, 502 U.S. 62, 67-68 (1992); *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983). The exception to this general rule is when there is an evidentiary error so serious as to violate the fundamental right to a fair trial. *See Estelle*, 502 U.S. 71-72.

The contested evidence was admissible under both New York and federal evidentiary rules. New York "parallel[s] federal law . . . allow[ing] for admission of evidence regarding prior bad acts and/or uncharged crimes where it is relevant to

an issue other than a defendant's propensity to commit the act or crime." *Feliciano v. Berbary*, 2003 WL 22832638 *3 (S.D.N.Y. Nov. 25, 2003). Federal Rule of Evidence 404(b) specifically permits the introduction of such evidence when its purpose is to prove, inter alia, motive, opportunity, or intent, but not "the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b)). Here, the challenged testimony was properly admitted to establish the murderer's identity and intent, as well as corroborate Smalls' testimony.

The introduction of evidence concerning the four robberies committed prior to the murder was relevant, at a minimum, to the issue of identification. First, the testimony of the victims of those robberies identified Williams as wearing a light colored shirt and dark jeans and Smalls as wearing white or cream colored shorts and zippered red jacket, which supports the conclusion that Williams - as opposed to Smalls - committed the murder as (1) Courtney McNaught testified that the shooter wore a light colored shirt; (2) Maiello testified he saw a black man wearing an orange ski cap, oversized beige shirt and blue jeans as he exited the parking lot just before the shooting; and (3) Christopher McNaught testified that after hearing a shot he saw a black man wearing an orange ski hat, light colored shirt and dark pants bending over Mr. Erlich. *Cf. United States v. Lombardozzi*, 2003 WL 1907969 (S.D.N.Y. Apr. 17, 2003) (evidence of prior crimes/ bad acts admissible during prosecution's direct case to establish identity); Manning v. Walker, 2001 WL 25637, *7 (E.D.N.Y. Jan. 3, 2001) (same). Additionally, the testimony of the robbery victims placed Williams in possession of a light or silver-colored automatic gun,

26

corroborated Mrs. Erlich's 911 call estimate of Williams' age, corroborated Smalls' testimony, was probative of the intent elements of the crimes charged, and was probative of Williams' knowledge that the watch he possessed at the time of arrest was stolen. *Cf. Miller v. Portuondo*, 151 F. Supp. 2d 245, 248 (E.D.N.Y. 2001) (prior crimes evidence properly admitted to establish intent).

The Appellate Division's conclusion that evidence of the Queens robberies was properly admitted is neither contrary to, nor an unreasonable application of, clearly established federal law.

### 2. Introduction of Newspaper Articles

By way of background, Jade Howard testified that she went to the police after seeing two separate newspaper articles (one is Newsday and one in the Daily News) about the arrests of petitioner and Smalls for the murder of Alain Erlich. Defense counsel had both articles marked and showed them to Howard who identified the articles as the ones she saw. The Newsday article was admitted into evidence. The prosecutor initially objected to the admission of the Daily News article on the ground the copy was unclear. At a side-bar the prosecutor withdrew his objection. When the court asked the defense if he wished to offer it anew, counsel replied yes but with certain redactions. The prosecutor then objected again. The case was then adjourned for the weekend without the matter being resolved. When the trial resumed on Monday, the matter was addressed again. Eventually the Daily News article was admitted into evidence. The court informed the jury that the article has been admitted into evidence and would be shown to them with a

section of it blacked out and the jury was not to speculate about that section.  The court declined the defense request to instruct the jury "not to take [petitioner's prior record] into consideration until such time as he takes the stand" and instead instructed the jury to "strike from their minds" the paragraphs of both the Daily News and Newsday articles that referred to petitioner's arrest record, as that information was not to be considered during their deliberations. (Trial Tr. at 565-90.)

Given the presumption that jurors follow curative instructions, *Moore v. Conway,* 476 Fed. Appx. 928, 931 (2d Cir. 2012); *United States v. Stewart*, 590 F.3d 93, 124 (2d Cir. 2009) and the AEDPA's differential standard, this Court cannot say that Appellate Division's rejection of the claim that the introduction of the newspaper articles denied petitioner a fair trial is contrary to, or an unreasonable application of, clearly established federal law.

### 3. Prosecutorial Misconduct

" 'The appropriate standard of review for a claim of prosecutorial misconduct on a writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.' " *Moore*, 476 Fed. Appx. at 930 (quoting *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir. 1994). To meet this standard, "a state habeas petitioner must show that the prosecutor's conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Moore*, 476 Fed. Appx. at 930 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). The

issue is not simply whether the prosecutor's comments or conduct were "undesirable or even universally condemned." *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Accordingly, a mere showing of prosecutorial misconduct does not necessarily entitle a petitioner to habeas relief. *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir. 1994). Instead the petitioner must show that he "suffered actual prejudice because the prosecutor's comments . . . had a substantial and injurious effect or influence in determining the jury's verdict." *Id*. Thus, "a defendant asserting that a prosecutor's remarks warrant a new trial faces a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of his right to a fair trial." *United States v. Banki*, 685 F.3d 99, 120 (2d Cir. 2012) (internal quotation marks omitted).

Williams identifies the following instances of prosecutorial misconduct: "forcing petitioner to accuse each prosecution witness of lying, compelling petitioner to give up his personal notes in violation of his constitutional rights, disparaging trial counsel's argument as attempts to 'confuse' and 'fool' the jury, labeling the petitioner as a 'criminal' and 'liar,' mischaracterizing the defense as accusing the victim's wife of lying, repeatedly appealing to the juror's sympathy for the victim's wife, resorting to improper bolstering and speculating on a motive without any support in the evidence."  Pet.'s Mem. at 35.  These alleged instances of misconduct are appropriately addressed in the following four groups: comments by the prosecutor; misconduct during cross-examination of petitioner; forcing Williams to give up his notes in violation of his constitutional rights and using those notes in

violation of the trial court's *Sandoval*[4] ruling; and remaining silent when the newspaper articles reflecting his criminal history were offered into evidence.

a. <u>Comments by the Prosecutor</u>

Williams sets forth  the following litany of statements which he contends constitute prosecutorial misconduct such as to warrant habeas relief:

> Here the prosecutor argued, **"Mr. Fishman asked [prosecution witnesses] a few questions. He didn't ask them all questions.  I had to get up and ask a few more questions which, which clarified things."** (T.T. at 1472). **"So don't get confused by arguments a lawyer makes, or questions a lawyer asks."** (T.T. at 1472). He warned the jury not to be **"fooled"** by the defense attorney's arguments that Smalls was incredible, because the attorney had not fully questioned Smalls concerning what he claimed he saw: **"Mr. Fishman spent most of his time on his cross-examination and his summation, telling you about Smalls' prior criminal behavior. He didn't ask him many questions about the shooting, did he? No question to Mr. Smalls about what he saw during the shooting, what he saw his own client do during the shooting. Nothing. I suggest to you, don't be fooled by the argument . . . don't be fooled by saying he's a bad guy."** (T.T. at 1475-77).
>
> The A.D.A. proceeded to label petitioner as a "**Criminal."** **"If he [Smalls] is a criminal, what in the world is this man."** (T.T. at 1477) (Objection sustained). Later the prosecutor manufactured the highly prejudicial suggestion that because of petitioner's history, it spelled guilt of the instant murder,
>
> "**But what you have here is a person with four prior felony convictions. He's been upstate three**

[4] In *People v. Sandoval*, 34 N.Y.2d 371 (1974) the New York Court of Appeals established a procedure available to defendants to obtain a prospective ruling as to which portions of a defendant's prior record can be used at trial by the prosecution for impeachment  should the defendant testify.

**separate times. He got out two weeks before this murder. He's already found in possession of a gun. He's already shooting at people in Queens. He's already committed robberies in [Q]ueens. <u>He's charged with murder in the first degree.</u> Based upon what his background is, his credibility, do you thing the oath means that much to Anthony Williams?** (T.T. at 1508) (Objection overruled) (Emphasis added)

**With respect to Mrs.** Erlich, the prosecutor spared no opportunity to appeal to the juror's sympathies for her loss, and wrongly charged the defense with accusing her of intentionally lying (T.T. at 1496-1497).

**"Now, Mrs. Erlich. Mr. Fishman very aggressively, I suggest to you, is saying to you that this woman can't be believed. This woman who lost her husband, who [objection sustained] you heard her testimony. You heard what she went through that evening. He stands up here and says, don't believe her. Well, ask your selves, ladies and gentleman, who among you would be in your right mind if you witnessed what Illone [sic] Erlich witnessed that night? (Objection sustained). God forbid you witnessed your loved ones getting shot in the head [objection sustained]. Anybody, any human being witnesses their husband lying on the ground (objection overruled)** (T.T. at 1497-1497)

And further:

**"[T]his crime all these crimes, the murder, the attempted robbery, everything is horrible. And Mr. Fishman described it, it's horrible. It's horrible beyond words. I can't begin to describe what happened to the Erlich Family."** (T.T. at 1516) (Objection sustained.)

In his opening statement, he stated the case was "**about the cheapness of life**" and "**about the victim, a truly innocent, who was coming home from his second job of the day, so that he could put  his daughter through college**. (T.T. at 440) (Objection sustained).

The prosecutor sought to bolster his case by openly wielding the credibility of the state and prejudicially calling attention to the urgency with which the victim's

family wanted justice sought:

> **I assure ladies and gentlemen, what you do with this case, your verdict in this case is important. Not only to the defendant, not only to the Erlich family, Mrs. Erlich and her daughter, Alicia; it is important to my client: The people of the [S]tate of New York.**" (T.T. at 1466-14-670).

> The prosecutor then bolstered the police witnesses with comments like, "we're lucky" to have experienced detectives (T.T. at 1509) (objection sustained), and claimed the testifying detectives have had long careers because "**they do a good job**" (T.T. at 1510) (Objection overruled). He bolstered Jermaine Smalls' testimony in his opening statement by stating that his deal with the prosecution was for "**truthful**" testimony (T.T. at 403-409)(objection overruled).

> Without any evidence being introduced to substantiate it, the A.D.A. speculated concerning petitioner's supposed motive to kill (T.T. at 1514-1515). Over repeated sustained objections, the prosecutor speculated that petitioner was motivated to intentionally kill someone because he was angry from previous altercation with others, or the victim had resisted, or petitioner simply wanted to experience a murder. (T.T. at 1514-1515).

> During the testimony of one of the Queens county witnesses, while defense counsel was questioning concerning the gun used, the prosecutor inflammatorily suggested in open Court that defense counsel "**put it [the gun] in front of her face, like [petitioner] did.**" (T.T. at 531) (the trial [c]ourt then cautioned the A.D.A.)

Pet.'s Mem. at 38-41 (emphasis and citations as in original).

When viewed in the context of defense counsel's summation, many of the comments Williams' asserts are objectionable were not improper since they constituted fair comment upon "the evidence, issues, and hypotheses propounded by the defense." *United States v. Marrale*, 695 F.2d 658, 667 (2d Cir. 1982); *see Bryson v. Sheahan*, 2013 WL 5502835, *33 (E.D.N.Y. Oct. 1, 2013). Even if improper, the

prosecutor's misconduct did not amount to substantial prejudice to Williams. First, objections to some of the claimed misconduct were sustained by the trial court. Additionally, "[t]he trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence." *Id.* "The cumulative effect of the challenged statements . . . was not so inflammatory or egregious as to require a finding of substantial prejudice . . . [and t]he clear evidence or [petitioner's] guilt demonstrates that he was not prejudiced by the prosecutor's improper remarks." *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990).

Although this Court will not go over each of the alleged improprieties, it is important to note that the prosecutor's statements in this case pale in comparison to the statements the Supreme Court held do not merit habeas relief in *Darden*. Moreover, a prosecutor may generally describe evidence as "unrefuted," "uncontradicted," or "not confronted on cross-examination." *See United States v, Iorizzo*, 786 F.2d 52, 61 n. 4 (2d Cir. 1986). And, there is no error in arguments that the jury should not "be fooled." *Marrale*, 695 F.2d at 667; *see also* Mehler, Gleeson, & James, *Federal Criminal Practice: A Second Circuit Handbook* §47-4 (15th rev. ed. 2015). Finally, the prosecutor's reference, in closing, to petitioner's criminal record did not argue propensity, only credibility.

In sum, taken together with the fact a number of objections were sustained and the trial court's instructions, inter alia, that the jury base their decision on the

evidence alone and that arguments of counsel are not evidence, together with the weight of the evidence against Williams, *cf. Darden*, 477 U.S. at 182, this Court cannot say that the Appellate Division's rejection of Williams' claim of prosecutorial misconduct was contrary to or constituted an unreasonable application of clearly established Supreme Court law.

### b. Cross-Examination of Petitioner

Williams next contends that the prosecutor engaged in misconduct by forcing him to accuse the prosecution witnesses of lying. During his cross-examination, Williams stated that while he was in custody "none of [the detectives] said" what they testified to at trial. The prosecutor then asked "Are you saying they're lying?" Defense counsel objected and the objection was sustained. (Trial Tr. at 1389-91). In its preliminary instructions, the trial court instructed the jury that: "If, however, I believe that the objection is a valid objection, I will say objection sustained. You as jurors must draw no inference, either from my ruling or from the question, itself." (Trial Tr. at 425.) Given that instruction and the trial court's sustaining of the objection, the state court's rejection of petitioner's claim that this denied him a fair trial is neither contrary to nor an unreasonable application of federal law.

### c. Production of and Use of Notes

During his testimony, Williams was reading from notes that he prepared prior to trial concerning his prior convictions and Smalls alleged confession while the two were being transported for a court appearance. When the prosecutor objected, Williams stated he needed the notes to refresh his recollection. The trial

court permitted Williams to use the notes but marked them for identification and directed that a copy be given to the prosecution. According to Williams, being forced to produce these notes and the prosecution's questioning about them violated his constitutional rights. This claim has no merit.

Rule 612 of the Federal Rules of Evidence provides, in relevant part, that when a witness uses a writing to refresh memory when testifying, "an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness about it, and to introduce in evidence any portion that relates to the witness's testimony." Fed. R. Evid. 612. Petitioner's rights were not violated by being required to produce the notes.

Nor did the prosecution's use of the notes violate the trial court's *Sandoval* ruling. Although the prosecutor asked about the number of times in the past Williams had received *Miranda* warnings, his questions did not elicit information about those convictions precluded by the trial court's *Sandoval* ruling.[5]

d. <u>Silence on Proffer of Newspaper Articles</u>

Petitioner also contends that the prosecutor engaged in misconduct when he "deliberately" did not inform the trial court that the text of the Newspaper articles defense counsel sought to introduce contained prejudicial information concerning Williams' prior record. Assuming arguendo such is considered misconduct, given

_____

[5] Moreover, as discussed *infra* at p. 42, Williams told the jury about his record as part of the strategy to use his experience with the criminal justice system to support that he would not have made any statements to the police.

trial court's limiting instruction and the earlier noted presumption that jurors follow curative instructions, Williams cannot show actual prejudice.

In sum, the Appellate Division's rejection of William's prosecutorial misconduct claims is not contrary to or an unreasonable application of Supreme Court law.

### B.    The Verdict was Against the Weight of the Evidence

The Appellate Division considered the claim of insufficient evidence on petitioner's appeal, *see People v. Williams*, 209 A.D.2d 570, 736 N.Y.S.2d 633 (2d Dept. 2002), and this Court's evaluation of the sufficiency of evidence at trial is limited to a consideration of whether the state court's decision was contrary to, or unreasonably applied, clearly established Supreme Court law, or whether the decision was based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2). It was not.

A habeas petitioner relying on insufficiency of the evidence at trial " 'bears a very heavy burden.' " *Diaz v. Greiner*, 110 F. Supp. 2d 225, 233 (S.D.N.Y.2000) (quoting *United States v. Rivalta*, 892 F.2d 223, 227 (1989)); *see also United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993). The standard for habeas review of the legal sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307 (1979). All possible inferences that may be drawn from the evidence must be construed in the prosecution's favor. *See Maldonado v. Scully*, 86 F.3d 32,

35 (2d Cir.1996). In making this assessment, a court may neither "disturb the jury's findings with respect to witnesses' credibility,"*United States v.. Roman*, 870 F.2d 65, 71 (2d Cir.1989) (citing *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir.1985)), nor "make credibility judgments about the testimony presented at petitioner's trial or . . . weigh conflicting testimony."*Fagon v. Bara*, 717 F. Supp. 976, 979 (E.D.N.Y.1989) (citing *United States v. Zabare*, 871 F.2d 282, 286 (2d Cir.1989)). Thus, under this "rigorous standard," a " 'federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." ' *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994). *See also Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y.1996) (Federal habeas courts " 'are not free to reassess the [fact-specific] credibility judgments by juries or to weigh conflicting testimony. On collateral review, [a federal habeas court] must presume that the jury resolved any questions of credibility in favor of the prosecution.' ") (quoting *Anderson v. Senkowski*, 1992 WL 225576, at *3 (E.D.N.Y. 1992), *aff'd*, 992 F.2d 320 (2d Cir.1993)).

Viewing the evidence in the light most favorable to the prosecution and presuming that the jury resolved all questions of credibility in the prosecution's favor, the Court concludes that the Appellate Division correctly held that there was sufficient evidence to establish Williams' guilt beyond a reasonable doubt. The

evidence at trial, as recounted *supra* at pages 4 to 15, was more than adequate to prove to a rational trier of fact that Williams was guilty as charged. That evidence, to partially recount, included testimony that on the night of July 31, 1996, Williams and Smalls engaged in a robbery spree and ended up by the Green Acres Mall in Valley Stream. Spotting Alain Erlich returning home to his apartment in the complex across from the mall, Williams, who stands 5'9" tall and was armed with a .25 semiautomatic handgun, went to the complex to rob him while Smalls waited by the entrance to the apartment complex as a lookout. Maiello, driving out of the lot saw a black man walking into the complex wearing an orange ski hat, oversized beige shirt and blue jeans. Courtney McNaught saw a black man wearing a light colored shirt and taller than Mr. Erlich, who was 5'6", holding a gun to Erlich's neck and then shoot him. She then saw the man bend over Mr. Erlich and grab at his back pocket. Christopher McNaught heard a shot and ran to the window where he saw a black man wearing an orange ski hat, light colored shirt, and dark pants bent over Mr. Erlich near his pockets. Mrs. Erlich heard the shot, ran to her open living room window and saw her husband lying on the ground with a man bending over him trying to reach behind him. She screamed and the man looked up in her direction; she could see him quite clearly with a building floodlight illuminating his face. He was wearing a orange cap. Both Christopher and Courtney heard the scream and saw the man look up towards Mrs. Erlich. A discharged .25 caliber shell casing was found near the pool of blood from the victim and the size of the entrance wound and nature of the injury were more consistent

with a .25 caliber bullet than any other. Approximately 30 minutes after the shooting, Smalls, who is 5'6" tall, was arrested wearing a red jacket and white shorts. A .32 caliber revolver was found in the area of his arrest and no empty shell casings were found in the cylinder. Smalls decided to cooperate and identified Williams as the shooter. Williams was arrested the following day carrying a loaded .380 caliber handgun. Although not told that the police were investigating a homicide defendant stated, among other things, "is he dead?"; "he shot with a .25?"; and "why did he move?" Mrs. Erlich was shown a newspaper article by a friend two days after the homicide and recognized the photo of Williams as the man who looked up at her when she screamed. Six month later she identified petitioner in a line-up as the man who looked up at her when she screamed and also identified him at trial as the man she saw standing over her husband. Upon being shown a photo of Smalls, she testified that he was not the man she saw standing over her husband.

In sum, there was sufficient evidence to establish Williams' guilt beyond a reasonable doubt. The Court concludes that the Appellate Division's decision was not an unreasonable application of clearly established Supreme Court law.

### C.    <u>Ineffective Assistance of Counsel</u>

In seeking habeas relief, petitioner also contends that he was denied effective assistance of counsel at trial for two reasons. First, "counsel introduced into evidence a newspaper article depicting a photograph of petitioner, for the jury's examination, as part of his cross-examination of one of the Queens county robbery victims, without realizing that what was being passed along to each juror was a

newspaper article describing petitioner's criminal history and that he was being held without bail for the murder charges." (Pet.'s Mem. at p.12.) Second, "[d]uring cross-examination of [Smalls and Mrs. Erlich] trial counsel failed to elicit some of the important facts supporting the defense." (*Id.* at p. 22.)

      1. <u>Legal Standard</u>

The Sixth Amendment provides that a criminal defendant "shall enjoy the right . . . to have the assistance of Counsel for his defense." U.S. Const. amend. VI.

In order to prevail on a Sixth Amendment claim, a petitioner must prove that

      (a)      counsel's representation "fell below an objective standard of reasonableness" measured under "prevailing professional norms," and

      (b)      "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

<u>Strickland v. Washington</u>, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "In assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case viewed as of the time of counsel's conduct, . . . and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528 (2d Cir. 1994) (internal quotation marks and citations omitted).

Second guessing the tactical and strategic choices made by counsel is seldom appropriate. "Courts in this district have routinely refused to find ineffective assistance of counsel given the wide range of conduct considered reasonable." *Occhione v. Carpa*, – F. Supp. 3d –, 2015 WL 3879534 (E.D.N.Y. 2015) (citing *Melendez v. Heath*, 2014 WL 2440499, at *5 (E.D.N.Y. May 30, 2014); *Gordon v. Bradt*, 2014 WL 1237370, at *8 (E.D.N.Y. Mar. 25, 2014); *Garcia v. Smith*, 2014 WL 905544, at *20–21 (E.D.N.Y. Mar. 7, 2014); *Johnson v. Taylor*, 2010 WL 2735770, at *4–6 (E.D.N.Y. July 8, 2010).) "If counsel was actively engaged . . . in various aspects of a defense, ineffective assistance is rarely found." *Occhione*, 2015 WL 3879534 at *15; *see Caimite v. Fischer*, 2009 WL 236917, at *5–6 (E.D.N.Y. Feb. 2, 2009) (trial counsel that engaged in pretrial discovery, effectively cross-examined witnesses, made cogent opening, appropriate objections and motions during trial, and made appropriate charge requests and sound closing arguments considered effective).

### 2. Introduction of Newspapers Articles

Williams claims that his counsel was ineffective for introducing into evidence without redaction the Newsday and Daily News articles concerning his and Smalls' arrest for the murder of Mr. Erlich.

As set forth by Respondent, it appears that "petitioner's trial counsel made a strategic weapon to use petitioner's criminal record as an offensive weapon, and he began doing so early on in the case by placing into evidence the two newspaper

articles without seeking to have them redacted, and without seeking a limiting instruction that went beyond telling the jury that it was not to consider the information until petitioner testified." (Resp.'s Mem. at 32.) "Counsel then continued this strategy during petitioner's testimony, wherein petitioner set forth his criminal record, using it in part to explain the nature of his relationship with Smalls; to establish that petitioner would not voluntarily make an incriminating statement, particularly a crime that petitioner testified to having no role in; and allowing petitioner to set forth an innocent explanation for those statements that he acknowledged making." (*Id*. citing Trial Tr. 1301-03, 1308-35, 1374-79, 1390)  In keeping with his argument that a person of Williams' experience with the criminal justice system would know not to make incriminating statements, counsel argued during closing that "Williams told you about his record.  He told you, no, I don't give statements. I submit to you that he didn't give a statement to Detective Ridden, either. Ridden is not telling the truth." (*See id*. citing Trial Tr. 1446-51.)  Given the amount of proof of his client's guilt, counsel's decision to pursue such a strategy falls within the wide range of reasonable professional assistance.[6]

Moreover, given the presumption that jurors follow curative instructions, *Moore,* 476 Fed. Appx. at 931; *Stewart*, 590 F.3d at124, and that the convictions, or

---

[6] To the extent that petitioner claims that counsel's claimed error in admitting the newspaper articles forced him to testify, the record does not support this claim.  As respondent notes, when asked about the notes he was using during his testimony, "petitioner acknowledged that he had made the list of convictions [of] his own volition prior to the commencement of the trial so that, when questioned . . . he would remember 'the sequence they went in.' " (Resp. Mem. in Opp. at 36 (citing Trial Tr. 1338-39).)

some of them, were admissible under the trial court's *Sandoval* ruling, the prejudice prong of the *Strickland* test has not been met.

### 3. Cross-examination of Smalls and Mrs. Erlich

Petitioner asserts that counsel's performance was defective because (1) "of his inexplicable failure to question Mrs. Ehrlich whether she ever provided a detailed description of the perpetrator and what that description was;" (2) "by failing to follow-up on the claim . . . that although she observed the Newsday article when a neighbor presented it to her, she claimed she had not read the article;" and (3) he "never asked Smalls to explain the discrepancies between what he testified to, and what he had stated to police in his confessions." (Pet. Mem. at pp. 23, 25-26.) None of these claims rise to a standard of deficient representation falling "outside the wide range of professionally competent assistance."

With respect to the alleged "soft" cross-examination of Mrs. Erlich, counsel's approach was justified by the desire to avoid being seen in the eyes of the jury as badgering the victim's widow. Additionally, cross-examining her on her claim that she did not read the newspaper article may have only reinforced her testimony that she did not read the article. Finally, counsel did elicit from Mrs. Erlich that she did not remember how many officers she spoke to that night or what she said to them and that in her 911 call she said she had seen "some kid running away with an orange cap." This line of questioning demonstrated that she was so distraught she could not provide the police with a specific description of her husband's attacker and provided support for the defense theory that her identification of Williams was not

the result of her own observations but rather the result of publicity.

Turning to the cross-examination of Smalls, notwithstanding petitioner's assertions to the contrary, counsel did in fact cross-examine Smalls about the inconsistency between his trial testimony and what he told the police. By way of example, counsel elicited that Small's written statement to the police did not mention the visit to Billy Barnes' house where he saw a .25 caliber gun, left the room and when he returned the gun was nowhere in sight. (Trial Tr. 815-23.) Having reviewed the transcript, it is apparent to this Court that counsel was prepared for the cross-examination of Smalls and conducted it effectively. Among other things, counsel brought out that Smalls was going to benefit from his cooperation agreement in ways not testified to on direct and he impeached Smalls with his testimony before the grand jury.

Having considered petitioner's claims of ineffective assistance of counsel in light of the transcript, they do not support habeas relief. "On habeas review a federal court may reverse a state court ruling only where it was so lacking in justification that there was no possibility for fairminded disagreement." *Fischer v. Smith*, 780 F.3d 556 (2d Cir. 2015) (internal quotation marks omitted). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Viewed through the prism of the AEDPA's differential standard, the Appellate Division's rejection of Williams' ineffective assistance of counsel claim is neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.

### D.    Line-up and In-Court Identification Violated Due Process

Williams contends that his due process rights were violated when the trial court permitted testimony concerning Ilona Erlich's identification of petitioner in a line-up and permitted Ms. Erlich to identify him at trial, even though she had been "irreparably tainted" by the newspaper photos. Pet.'s Mem. at 44.

To partially reiterate, three days after the murder Mrs. Erlich was shown a newspaper article containing photographs of Williams and Smalls taken by the newspaper's photographer. She did not read the article but looked at the pictures and recognized the photo of petitioner but did not recognize the photo of Smalls. Five months later, she identified petitioner in a line-up as the person she saw bending over her husband who looked up at her when she screamed.  One and a half years later, she identified Williams in court. Prior to trial, the defense moved for a hearing to determine whether the line-up was tainted by Mrs. Erlich's viewing of a photo of Williams in either the newspaper or the television, asserting that the police had made the media their agents by permitting the exposure of William's photographic likeness to the media. The trial court denied that motion based on the prosecution's representation that the police had not supplied the photos to the media nor exhibited those photographs to any witness and New York law that there is no basis for suppression when a witness happens to see a photo in a newspaper that was not supplied by law enforcement. A *Wade* hearing was held as to the line-up and the trial court found that it was proper, with all participants of similar age and appearance, with petitioner's trial attorney having chosen petitioner's position

in the line-up, and with Mrs. Erlich immediately identifying Williams as the person she saw look at her in the parking lot. (Hearing Tr. 221-22.)

According to Williams

> Illona [sic] Ehrlich was not asked to attend a line-up soon after petitioner was arrested, that a number of media reports showed petitioner's photograph (T.T. at 565), that the hearing Court prevented the defense from establishing whether Mrs. Erlich had observed these reports (H.T. at 93-94, that the record nevertheless established that Mrs. Erlich had observed at least one of these reports (T.T. at 1037-38), that prosecutors and police officers divulged information concerning petitioner's prior record and his alleged involvement in the shooting to the media prior to the Line-up (See Pet. Mot. For "Gag Order"), and that the prosecution did not seek to have Mrs. Erlich attend the line-up until after she observed, at least, one of the media reports.

Pet.'s Mem. at 44-45.

Federal courts have found identifications reliable where there were seven months between the crime and the confrontation, *Neil v. Biggers*, 409 U.S. 188, 201 (1972); where witnesses viewed pictures of the defendant or saw the defendant alone before seeing the defendant in a lineup, *United States v. Concepcion*, 983 F.2d 369, 378 (2d Cir. 1992) (one defendant seen by witness in the hospital before the lineup and another defendant was seen in a photo before the lineup), *see also Epps v. Ercole*, 2013 WL 2158582, at *5, *10 (S.D.N.Y. May 17, 2013) (Maas, Mag. J.) (suppression of lineup identification not warranted when witness saw photos of the suspect before the lineup). Moreover, "[w]hen an identification results from circumstances that are not police-arranged, the defendant . . . is limited to the

constitutional safeguards available at all trials – compulsory process and cross-examination –  in challenging the reliability of the identification testimony." Mehler, Gleeson, & James, *Federal Criminal Practice: A Second Circuit Handbook* §23-4 (15th rev. ed. 2015) (citing *Perry v. New Hampshire*, 132 S. Ct. 716, 730 (2012)). In view of the foregoing, the Court does not find that the state courts' rejection of Petitioner's identification claims was contrary to or an unreasonable application of clearly established Supreme Court law.

Moreover, much of petitioner's argument rests on the suggestion that the eyewitness testimony was not credible and should not have been given enough weight to result in his conviction. However, under both the state and federal law, issues of credibility, as well as the weight to be given to evidence, are questions to be determined by the jury, which is "exclusively responsible for determining a witness's credibility." *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993). Federal habeas courts " 'are not free to reassess the [fact-specific] credibility judgments by juries or to weigh conflicting testimony. On collateral review, [a federal habeas court] must presume that the jury resolved any questions of credibility in favor of the prosecution.' " *Vera v. Hanslmaier*, 928 F. Supp. 278, 284 (S.D.N.Y.1996) (quoting *Anderson v. Senkowski*, 1992 WL 225576, at *3 (E.D.N.Y. 1992), *aff'd*, 992 F.2d 320 (2d Cir. 1993)); *see also Marshall v. Lonberger*, 459 U.S. 422, 432–35 (1983). Thus, to the extent that petitioner's claim challenges Mrs. Erlich's credibility or the weight of her testimony, it cannot provide a basis for

habeas relief.

### E. Sentence was Unlawful and Excessive

#### 1. Unlawfulness Claim

Williams' principal challenge to his persistent felony offender adjudication is essentially a factual claim within the meaning of 28 U.S.C. §2254(d)(2). This Court's role is not to find facts de novo but instead to decide whether petitioner has shown that the state court's findings are unreasonable or has rebutted their statutory presumption of correctness by clear and convincing evidence. Neither standard is met here given the nature of the offense of conviction, together with defendants' prior felony convictions and his commission of crimes while on parole. (*See* Sentencing Tr. at 20-27.)

Williams' also challenges his persistent felony offender status as violative of the rule announced in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). In *Apprendi*, the Supreme Court held: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id*. at 490 (2000); *Alleyne v. United States*, - -U.S. - -, 133 S.Ct. 2151, 2168, 186 L.Ed.2d 314 (2013) (same). The narrow exception regarding "prior convictions" exists, the Court has explained, because the procedural safeguards attendant to prior convictions mitigate Sixth Amendment concerns. *Apprendi*, 530 U.S. at 488.

Petitioner's claim falls squarely under the Second Circuit's decision in *Portalatin*, which examined New York's discretionary persistent felony offender

statute and found that, "as interpreted by the New York Court of Appeals, [the statute] creates a recidivist sentencing scheme in which the only factual predicates necessary to impose the enhanced sentence relate to the defendant's criminal history." *Portalatin v. Graham*, 624 F.3d 69, 93–94 (2d Cir.2010) (en banc); *see also West v. Breslin*, 410 Fed. App'x 393, 394 (2d Cir.2011) ("New York's persistent felony offender statute [i]s consistent with the U.S. Supreme Court's holdings . . . ."). Accordingly, Petitioner's *Apprendi* claim is without merit and the Appellate Division's rejection of this claim was neither contrary to nor an unreasonable application of Supreme Court law.

### 2. Excessiveness Claim

Relying on "the dismal facts of defendant's societal past" and "the constructs of this petitioner's trial with its susceptibility to uncertainty," Pet.'s Mem at 51, Williams assert the sentence of life without the possibility of parole was excessive.

The Second Circuit has held that no federal constitutional issue amenable to habeas review is presented where, as here, the sentence is within the range prescribed by state law. *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992); *Fielding v. LeFevre*, 548 F.2d 1102, 1108 (2d Cir.1977); *Underwood v. Kelly*, 692 F. Supp. 146 (E.D.N.Y.1988), *aff'd*, 875 F.2d 857 (2d Cir. 1989). Petitioner was convicted of, inter alia, one count of Murder in the First Degree. New York's sentencing statute provides that a sentence of life imprisonment without parole may be imposed upon a conviction for such offense. *See* Penal Law §§ 70.00(5), 125.27. Because Petitioner's sentence falls within the prescribed statutory scheme, his claim does

not present a federal constitutional issue cognizable on habeas review. *Accord Webb v. LaClair*, 2014 WL 4953559 (S.D.N.Y. Sept. 30, 2014)*, Smith v. Lee*, 2014 WL 1343066 (E.D.N.Y. Mar. 31, 2014) (collecting cases); *Peppard v. Fischer*, 739 F. Supp. 2d 303, 309 (S.D.N.Y.2010) (collecting cases).

### F. Issues Raised in Petitioner's Memoranda But Not in His Petition

In his memoranda, Petitioner raises issues which are not contained in his petition. *See, e.g.,* Pet.'s Mem. at 30 (asserting that the trial court's "refusal to allow trial counsel to cross examine Smalls and Mrs. Ehrlich [as to certain matters] deprived petitioner of his rights to Due Process, to confront witnesses against him, and to a fair trial.") Having reviewed these issues, the Court finds that they are either without merit or they are unexhausted and procedurally barred with no cause for the default and/or no resulting prejudice.

## CONCLUSION

Having considered all of petitioner's arguments and finding them to be without merit, the petition for habeas corpus relief is denied. Additionally, no certificate of appealability will issue because Williams has failed to make a substantial showing of the denial of a constitutional right as required by U.S.C. § 2253(c)(2). The Clerk of Court shall enter judgment accordingly.

**SO ORDERED.**

Dated: Central Islip, New York
     January 22, 2016             /s/  Denis R. Hurley
                                         Denis R. Hurley
                                         Senior District Judge